BRIAN J. STRETCH (CABN 163973)
United States Attorney

BARBARA J. VALLIERE (DCBN 439353)
Chief, Criminal Division

JOHN H. HEMANN (CABN 165823)
Assistant United States Attorney

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7478
FAX: (415) 436-7234
John.Hemann@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>AYMAN SHAHID,<br><br>Defendant. | Case No. CR 14-0271 YGR<br><br>GOVERNMENT'S MOTION FOR A DOWNWARD DEPARTURE AND SENTENCING MEMORANDUM<br><br>Date: March 3, 2017<br>Time: 3:00 pm |

The government has no objections to the Presentence Report, and agrees with both the Sentencing Guideline calculation and the criminal history score. The description of the offense conduct in the Presentence Report accurately describes the factual basis for defendant's conviction. The proper offense level is 31 and initially the Court should depart four levels, as it did at the sentencing of Discovery Sales, Inc., to a final offense level of 27 – as agreed upon in the plea agreement and recommended in the final PSR. The corresponding sentencing range before any further departure should 70 to 87 months, within Zone D of the Sentencing Guidelines.

The government moves for a further seven-level downward departure pursuant to U.S.S.G. § 5K1.1 to acknowledge defendant Shahid's substantial cooperation. If granted, this departure would place Shahid at an offense level 20, within Zone D of the Sentencing Guidelines. The sentencing range

at this level is 33 to 41 months.

The government recommends a sentence of 36 months and a fine of $15,000.

A. Factual Background

This case tells the story of how one small group of the bad mortgage loans that created the "housing bubble" in 2006-2008 came to be. It is a story of how people who could not afford to buy homes were encouraged and allowed to buy homes – sometimes multiple homes – without using any of their own money. It is a story of how unethical people worked together to shovel garbage mortgages into the mortgage lending system, which allowed other unethical people to repackage them and sell them to people who didn't know how bad they were.

Ayman Shahid was one of those unethical people, and he committed criminal actions that contributed to the mortgage crisis of the last decade. Before taking the point too far, however, it is important in fairness to stop and emphasize the "one of" part of that sentence. In the mid-2000s there were many such people operating in the home sales and mortgage loan industry, generating mountains of money by making and allowing millions of false statements and misleading representations to be made about every aspect and phase of the home mortgage loan industry. Whether one considers it reckless optimism or criminal profiteering, the real estate and banking industries had become infected to their core by people who falsely claimed and possibly even believed that home prices would continue to rise indefinitely. No loan was a bad loan; everyone was making money. Shahid participated, but was only one of those many people.

But he most certainly was one of the people who greedily took advantage of the circumstances prevailing at the time. Shahid was the vice president of Discovery Sales, Inc., the sales arm of an East Bay home building company. When the recession began in 2006, Shahid and others at Discovery devised a scheme to maintain the sales price of the new homes they were selling. The essence of the scheme was to offer new home buyers incentives in the form, primarily, of down payment and mortgage assistance. Discovery provided buyers with the down payments necessary to fund their mortgage loans and with payments on mortgages on their existing homes (whether they had existing homes or not).

The purpose of the scheme was to maintain the book value of the real estate assets owned by the Seeno companies in order to avoid either violating the terms of their credit lines or having to post

additional collateral to support the credit lines. The credit lines had to be secured by real property of a certain value; if the value went down, the credit lines would have to be terminated or more property used to secure them. The incentives provided to buyers were necessary to inflate the sales price of the homes that were sold in 2006-2008.

It was part of the scheme that Shahid and his discovery colleagues schemed to keep information regarding the incentives from the mortgage lenders. Although the mortgage lenders that worked with Discovery buyers had numerous red flags that Discovery buyer were not disclosing incentives that they received, the lenders were not informed about incentives provided to specific buyers or the amount or nature of the incentives.

Shahid led the effort to provide incentives and to keep the mortgage lenders from learning of the incentives. If the mortgage lenders had been informed of the incentives, their underwriters would not have approved the loans because the loan-to-value ratio would not have qualified. Discovery sold over 200 homes using undisclosed incentives. Most of these mortgage loans went into foreclosure or were sold short by the buyers, causing losses to the ultimate owners of the mortgages.

B. Sentencing of Related Defendants

Nine other individuals and one corporate defendant have been charged, pleaded guilty, and sentenced in cases involving Discovery Homes mortgage fraud.

In four related cases, CR 13-0556 YGR, the defendants were sentenced by this Court for fraudulently arranging mortgage loans for Discovery Sales homes:

- Tony Phan was an underwriter employed by Homecomings Financial, the now-defunct mortgage lender that funded the loan brokered by Park and Zevada. Phan pleaded guilty to conspiracy and was sentenced by this Court to three years probation with and 250 hours of community service.
- Miguel Arenas was a tax preparer who created false documents to support the fraudulent loan funded by Homecomings Financial. Arenas pleaded guilty to conspiracy and was sentenced by this Court to six months home confinement as a condition of three years probation.

- George Zevada was a mortgage broker who facilitated the fraudulent loan funded by Homecomings Financial. Zevada procured the false documents to support the loan from Arenas. Zevada pleaded guilty to conspiracy and was sentenced by this Court to nine months home confinement to begin a three year term of probation.
- Chang Park was Zevada's colleague and directed fraudulent home buyers to banks that would fund their loans. Park pleaded guilty to conspiracy and was sentenced by this Court to three years probation to start with seven and a half months home confinement.

Three defendants who were involved with Discovery Sales were sentenced in cases before Judge White.[1]

- Sharon Wang and Heather Yin were real estate brokers who brought unqualified and straw buyers to Seeno properties and helped them make fraudulent loan applications. Judge White sentenced them both to three years probation and community service. Case No. 11-0686 JSW.
- Jason Sterlino was a Discovery Sales, Inc. manager. He facilitated the sale of Seeno homes to unqualified and straw buyers to Seeno properties and helped them make fraudulent loan applications. He also accepted kickbacks totally approximately $100,000 from Sharon Wang and a crooked bank loan officer, and pled guilty to violating 18 U.S.C. § 215(a)(1). Judge White sentenced Sterlino to six months in prison and three years supervised release. Case No. CR 13-0231 JSW.

Finally, two other defendants have been sentenced by this Court:

- Discovery Sales pleaded guilty to violating 18 U.S.C. § 1344. This Court sentenced the company to pay a fine of $8 million and restitution to Fannie Mae and Freddie Mac of $3 million. Case No. CR 16-0199 YGR.
- Carey Hendrickson pleaded guilty to violating 18 U.S.C. § 1343 by purchasing multiple Seeno homes simultaneously using the incentive program, did not disclose the incentives

---

[1] The Wang and Yin cases initially arose from mortgage fraud schemes unrelated to Discovery Sales. They were assigned to Judge White before the government learned of the connection to Discovery Sales. The Sterlino prosecution arose from Wang's and Yin's cooperation. This is why the Wang, Yin, and Sterlino cases were not before this Court.

to the mortgage lenders, and claimed that each of the homes would be her primary residence. The Court sentenced Hendrickson to a three year term of probation, granting the government's 5K motions for a downward departure and additionally finding that Hendrickson's conduct was aberrant and she had demonstrated extraordinary post-plea good conduct. Case No. CR 12-0292 YGR.

C. The Offense Level Calculation And Downward Departure Because The Loss Is Overstated

The government agrees with the Probation Officer's Sentencing Guideline calculation, which is fully consistent with the parties' plea agreement. The total offense level is 31 and the parties and the probation officer agree that the offense level should be adjusted downward by four levels because, as to Shahid, a $75 million loss is overstated. In sentencing Shahid's former employer, Discovery Sales, Inc., the Court agreed that the loss was overstated and accepted the parties' joint request for a four level downward departure; the applicable facts and law are the same here and the same result should follow.

The 24-level increase to the offense level is based on a loss amount of $75 million that falls within the $65 to $150 million range at § 2B1.1(b)(1). The $75 million loss figure was calculated by an economic consultant for the government utilizing the two-step process approved by the Ninth Circuit in *United States v. Morris*: 1) calculate the greater of intended or actual loss, with the actual loss usually being the principal of the loan; and 2) detect the amount recorded or recoverable by the creditor from the sale of collateral. 744 F.3d 1373, 1374-75 (9th Cir. 2015). This two-step process applies to standard mortgage fraud cases; this is not such a case.

Notably, in conducting this estimation of loss,[2] the government's consultant focused strictly on home sales during the relevant time period in which the buyers received incentives from the programs at issue and the homes for a variety of reasons later went into foreclosure. This analysis was not based on an examination of the evidentiary record on a loan package-by-loan package basis, and does not purport to isolate Shahid's culpability on a loan-by-loan basis.

The United States Sentencing Guidelines calculation in the plea agreement before the Court includes a four-level downward departure under Section 2B1.1, Application Note 20(C) (downward

[2] The sentencing court need only make "a reasonable estimate" of loss. U.S.S.G. § 2B1.1, App. Note 3(C).

departure appropriate where offense level overstates the seriousness of the offense). This four-level departure is justified because the Guidelines offense level, driven primarily by the loss amount, substantially overstates the seriousness of Shahid's offense: 1) the Guidelines offense level is based on a loss amount that is the product of multiple sources, not solely Shahid's conduct; and 2) the Guidelines offense level does not adequately reflect the economic reality of the actual loss to the lender banks.

Section 2B1.1, Application Note 20(C) of the United States Sentencing Guidelines states: "There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted." For the reasons stated below, this is one such case. In 2005, the United States Supreme Court in *U.S. v. Booker* declared that application of the Sentencing Guidelines was no longer mandatory for district courts in imposing criminal sentences. 542 U.S. 220, 245 (2005). After *Booker*, the Sentencing Guidelines are advisory – district courts are required to consider the Sentencing Guidelines under 18 U.S.C. § 3553(a)(4), but are also permitted to tailor the sentence in light of other Section 3553(a) factors. *Id.* Despite the advisory nature of the Sentencing Guidelines, district courts routinely utilize downward departures in making sentencing determinations. The Ninth Circuit views a district court's implementation of a downward departure as "an exercise of post-*Booker* discretion to sentence a defendant outside the applicable guidelines range[.]" *U.S. v. Mohamed*, 459 F.3d 979, 987 (9th Cir. 2006).

In fraud-related cases, the Guidelines calculation is driven in large part by the loss amount and, therefore, a departure analysis often focuses on factors that affect the amount of loss. *See United States v. Roen*, 279 F. Supp. 2d 986, 990 (E.D. Wis. 2003) ("Because the loss determination essentially dictates the severity of the sentence, it is this determination that will almost always be the subject of departure scrutiny."). Thus, a downward departure may be warranted when "a loss determination results in an offense level that substantially overstates the seriousness of the severity of the offense." *Id.* The district court for the Eastern District of Wisconsin, in *United States v. Forchette,* summarized cases in which a downward departure was granted based on a loss amount that overstated the seriousness of the offense and identified several scenarios to which this departure is appropriate, two of which are relevant to this case.[3] 220 F. Supp. 2d 914, 924-25 (E.D. Wis. 2002). The two scenarios that provide grounds for a

[3] *Forchette* and the cases cited therein focus on application notes for since-repealed Section 2F1.1 of the

downward departure relevant to this case are: 1) "multiple causation," when the amount of loss is the product of sources separate from the defendant's conduct; and 2) a scenario when the Guidelines loss calculation does not reflect the "economic reality" of the loss actually suffered by the victims. *See also United States v. Lane*, 323 F.3d 568, 588 (7th Cir. 2003) (stating that a sentencing court has the discretion to depart downward and modify the loss amount to more accurately reflect the "economic realities of the crime.").[4] Either of these scenarios, alone, is an independent and legitimate basis for a downward departure. *Forchette*, 220 F. Supp. 2d at 929; *Roen*, 279 F. Supp. 2d at 991-92 (granting nine-level departure based only on "economic reality" scenario).

In this case, the $75 million loss figure is the product of multiple sources in addition to Shahid's fraudulent conduct, including the participation and complicity of the preferred lenders in the problematic implementation of the incentive programs; the culpability of individual homebuyers who failed to disclose incentives on loan documents; and the subsequent nationwide housing-market downturn and economic crisis during the relevant time period which dramatically inflated the amount of loss in this case.

In this situation where there are multiple causes of the loss amount beyond the defendant's control, the Ninth Circuit, along with numerous other circuit courts, has endorsed this "multiple causation" scenario as a valid basis for downward departure. *See United States v. Sarno*, 73 F.3d 1470, 1501 (9th Cir. 1995) ("[D]efendant may seek a downward departure to mitigate distortions occasioned by forced beyond the defendant's control.")[5]; *see also United States v. Ware*, 282 F.3d 902, 907 (6th

---

Sentencing Guidelines, which specifically references the "amount of loss" as overstating the seriousness of the offense. However, as noted by the district court in *Roen*, the change from Section 2F1.1 to Section 2B1.1 and the elimination of any reference to loss amount is "one of style rather than substance[.]" 279 F. Supp. 2d at 990 (quotations omitted).

[4] *Forchette* describes the "economic reality" scenario as one in which there is a gross disparity between the defendant's intended loss, which is used as the Guidelines loss amount, and the actual loss suffered by the victims. 220 F. Supp. 2d at 924-25. However, the Seventh Circuit in *Lane* demonstrates that the "economic reality" basis for downward departure can apply beyond the specific scenario described in *Forchette*. 323 F.3d at 588, 592 (affirming district court's downward departure based on the "economic realities of the crime" when pre-departure Guidelines level based actual loss calculation).

[5] The Ninth Circuit in *Sarno* relies on First Circuit law. 73 F.3d at 1501 (citing cases collected in *U.S. v. Shattuck*, 961 F.2d 1012, 1016-17 (1st Cir. 1992)). *See also U.S. v. Rogers*, 39 F.3d 1190 (9th Cir. 1994) (departure appropriate where, as a result of events outside of defendant's control, "the measure of loss is disproportionate to the defendant's culpability") (unpublished).

Cir. 2002); *United States v. Rostoff*, 53 F.3d 398, 406-07 (1st Cir. 1995); *United States v. Monaco*, 23 F.3d 793, 799 (3d Cir. 1994); *United States v. Gregorio*, 956 F.2d 341, 344–48 (1st Cir. 1992); *United States v. Carey*, 895 F.2d 318, 323 (7th Cir.1990)." The reason a departure is necessary in these circumstances is because "the victim loss table in U.S.S.G. § [2B1.1] presumes that the defendant alone is responsible for the entire amount of victim loss specified in the particular loss range selected by the sentencing court." *Gregorio*, 956 F.2d at 346. So any portion of the total loss sustained by the victim as a consequence of factors extraneous to the defendant's conduct is not deducted from total "victim loss" prior to the determination of the applicable guideline sentencing range. *Id*.

The First Circuit case of *United States v. Rostoff* is on point. 53 F.3d 398 (1st Cir. 1995). In *Rostoff*, defendant real estate developers worked with individual buyers and bank representatives to provide bank loans to borrowers to purchase condominiums, who later defaulted. *Id.* at 403. The defendants' Guidelines offense levels were driven in large part by the loss suffered by the FDIC, when the bank granting the loans became insolvent. *Id.* at 404. The *Rostoff* district court granted defendants' downward departures, finding that numerous factors, apart from defendants' involvement, inflated the FDIC losses. *Id.* 405. Primarily, the *Rostoff* district court focused on three causal factors: 1) the bank employees' involvement in the program and the court's skepticism over senior bank management's professed lack of knowledge or responsibility; 2) the individual condominium buyers' willing participation in the program; and 3) the collapse of the real estate market. *Id.* The First Circuit found the district court's downward departures reasonable, holding that the district court's finding of multiple causation was a proper legal basis to depart. *Id.* at 407, 411.[6]

All three of the sources that contributed to the Guidelines loss amount in *Rostoff* and justified a downward departure, in addition to defendants' conduct, also exist in this case with equal force. The loan agents for the lender banks in these transactions were aware of these incentive program payments.

---

[6] In *Rostoff*, the First Circuit's holding applied to the pre-1991 version of the Sentencing Guidelines. However, subsequent case law demonstrates that courts have continued to endorse "multiple causation" as a basis for downward departures under later versions of the Guidelines. *U.S. v. LaPoint*, 16 F. Supp. 3d 1006, 1009 (N.D. Iowa 2014); *U.S. v. Lamonda*, 2008 WL 68744, No. 6:05-cr-131-Orl-28UAM, at *22 (M.D. Fla., Jan. 2, 2008); *U.S. v. Keller*, 2005 WL 6192897, 3:04-CR-233-G, at *5 (N.D. Tex Oct. 17, 2008); *Roen*, 279 F. Supp. 2d at 990-91.

Similarly, the buyers were complicit: many did not disclose the incentive payments on the loan applications they submitted to the banks. The loan agents and buyers also had a responsibility to disclose these incentives.[7]

Finally, as set forth above, the downturn of the housing market and U.S. economy as a whole during the relevant time period of 2008-2009 was both historic and unforeseen. These market and economic forces had a nearly unprecedented impact on housing prices, which resulted in tens of thousands of homes in California going into foreclosure, including some that were sold by Shahid and Discovery Sales utilizing the incentive programs at issue in this case. There is no dispute that these larger economic forces played a significant role in causing the $75 million loss figure calculated using the *Morris* formula. As the court in *Rostoff* acknowledged, it would be unfair to apply the $75 million loss figure without recognizing how that number was generated by forces beyond the control or expectation of Shahid.

As stated previously, the Guidelines loss amount here is calculated under the Ninth Circuit's *Morris* formula – measuring the difference between the loan amount and the amount of the home sold after default. A downward departure based on the "economic reality" entails a scenario when the Guidelines loss calculation does not reflect the "economic reality" of the loss actually suffered by the victims. *Lane,* 323 F.3d at 588; *see also Forchette,* 220 F. Supp. 2d at 924-25 (downward departure appropriate when defendant's intended loss, used in Guidelines loss calculation, "bears no relation to 'economic reality.'"). In *Lane,* the Seventh Circuit reviewed the district court's sentencing of a real estate developer convicted of multiple counts of making fraudulent loan statements to a bank in violation of 18 U.S.C. §1014. 323 F.3d at 573. The Seventh Circuit upheld the district court's downward departure based on the Guidelines loss amount overstating the seriousness of the offense after consideration of ultimate losses to the bank victims. *Id.* at 586, 588. As stated by the Seventh Circuit in *Lane*, "Once the amount of loss is calculated under the guidelines, the court has the discretion to modify the amount of loss to more accurately reflect the economic realities of the crime and the time to

[7] The difficulty in apportioning loss between defendants and uncharged participants is a basis for departing downward. *See U.S. v. MacCaull*, 2002 WL 31426006, No. 00 CR 91-13 RWS, at *12-13 (S.D.N.Y. Oct. 28, 2002) (downward departure because loss amount was difficult, if not impossible, to apportion fairly).

take economic realities into account is at the district court's downward departure decision." (citations omitted).

The $75 million loss figure reflected in the Guidelines offense is grossly overstated and does not reflect the economic reality of the loss actually suffered by the banks. In fact, the lender banks generated revenue by originating and initially servicing the loans at issue and then again by repackaging and securitizing most of the loans on the secondary market. *See infra* Additional Sentencing Statement by United States. Given that the $75 million loss figure drastically overstates the actual losses suffered by the banks, the Court should exercise its discretion and depart downward so that the ultimate sentence more accurately reflects the economic reality of Shahid's and Discovery Sales' conduct in this matter.

The four-level downward departure included in the plea agreement sentence results in a Guidelines offense level that appropriately reflects the seriousness of Shahid's offense. As case law and experience make clear, the grounds for the actual extent of the downward departure at issue here is often difficult to justify quantifiably or by a ready formula. Consequently, the quantity of downward departure is within the district court's broad discretion. *U.S. v. Working*, 287 F.3d 801, 809 (9th Cir. 2002). There is no "algebraic formula" to determine a departure's extent, but rather determining the size of a departure is "quintessentially a judgment call." *Rostoff*, 53 F.3d 398, 409; *see also Working*, 267 F.3d at 809.

The four-level departure agreed to by the parties falls squarely in the range of precedents for downward departures where the loss amount overstates the seriousness of the offense. In upholding the district court's finding that the loss overstated the seriousness of the offense based on similar factors present in the instant case, the *Rostoff* court upheld departures that slashed offense levels by 1/3 and more – defendants facing between 27 months at the low end and as high as 41 months received sentences of 9 months and probation. 53 F.3d at 404, 411-12; *see also Roen,* 279 F. Supp. 2d at 990 (nine-level departure); *MacCaull*, 2002 WL 31426006, at *13 (five-level departure based, in part, on difficulty in apportioning loss between defendants and uncharged individuals).

A four-level departure is appropriate in this case where the government is unable to identify which financial institutions lost money, if any, except as to Fannie Mae and Freddie Mac. The rounded up $3 million restitution figure stands as the only calculated number representing the actual loss. In

contrast, the $75 million loss amount calculated for Guidelines purposes has no such provable link to any actual loss.  That figure is all-in and not a reasonable measure of Shahid's culpability.  Indeed, the $75 million figure is eight levels higher than the calculated loss of $3 million.  In these circumstances, a four-level departure is reasonable.  Similarly, a four-level departure is necessary in order to apportion causation to the loan agents, buyers and the housing-market downturn, all of which played a significant role in generating the $75 million loss number.

D. Motion For A Downward Departure For Substantial Assistance

The government moves for a further seven-level downward departure for substantial cooperation. Shahid cooperated by making numerous factual proffers to the FBI and U.S. Attorney's Office, and agreeing to testify in court or the grand jury if necessary.  Considering the relevant factors, below, Shahid should receive the benefit of a further downward departure, but ultimately should receive a significant term of imprisonment.

1. Shahid's cooperation provided substantial assistance.  U.S.S.G. § 5K1.1(i).  Shahid's guilty plea and conviction resulted directly in the prosecution and plea of Discovery Sales, Inc., his former employer.  In the corporate plea, the parties used the guidelines calculations upon which we agreed with Shahid and, on that basis, the Court ordered an $8 million fine and $3 million in restitution, which is the second largest criminal fine our office has collected in the past several years.  Shahid's plea made the Discovery guilty plea possible – it would have been much more difficult to get to that agreement as quickly as we did if Shahid had not plead and cooperated.

2. Shahid's cooperation was, in the government's estimation, truthful and credible.  U.S.S.G. § 5K1.1(ii).  Shahid provided extensive information about Discovery Sales and other executives at the company.  Shahid contended that the mortgage fraud scheme to which he admitted was devised, motivated, and supervised by others.  The FBI investigation, however, was not able to corroborate the information Shahid provided.  There were no other witnesses and no documentary evidence, other than Shahid's statements, that directly implicated other executives (the FBI interviewed dozens of witnesses and reviewed many thousands of documents).  Although logic and the overall circumstances suggest that others at least knew of Shahid's conduct and the overall scheme, ultimately the proof was lacking and the investigation was not able to establish proof beyond a reasonable doubt.

3. Shahid faced no meaningful risks as a result of his cooperation. U.S.S.G. § 5K1.1(iv). Shahid contends that he was threatened by his former employer and that his cooperation exposed him to the threat of violent retaliation. In February 2016, Shahid's former boss received a letter stating that Shahid was involved in fraudulent activities with his new employer in the San Diego area. The former boss promptly made two phone calls to Shahid's employer and inquired about Shahid's employment, without revealing his identity. After the second call, Shahid and his employer called back. The former boss answered the telephone and immediately ranted that he was going to "kill" Shahid and that Shahid was "going down."

This exchange appears to have been triggered by the letter that was received; the FBI was not able to determine the sender of the letter. The threatening statements were made in a telephone call made by Shahid to his former employer's office. There is no evidence that Shahid was ever in any actual danger and, though totally and completely inappropriate and potentially retaliatory in nature,[8] it appears that his former boss was venting anger rather than actually threatening death or harm to Shahid. Shahid has worked and lived openly since beginning his cooperation and, other than this incident, has not experienced any threats of any sort. There is no evidence that Shahid was ever in any danger.

4. Shahid's cooperation was not timely. U.S.S.G. § 5K1.1(v). The FBI's investigation was made known to Shahid when the FBI searched the Seeno businesses in early 2010. Shahid made no effort to cooperate with the government before he was indicted in 2014. He did not agree to plead guilty and cooperate until 2015. It is hard to say whether his cooperation might have been more productive if it had come earlier, but it is a certainty that by the time he did decide to cooperate, the investigatory options had dwindled to few in number.

5. Shahid has not engaged in any criminal activity subsequent to his plea, but nor has he demonstrated exemplary post-plea conduct. Following his plea, Shahid secured employment in Southern California, but the job was short-lived and he and his employer parted on overtly hostile terms. In addition, Shahid acquired dozens of internet domain names, including two that were composed of the

[8] The government was not able to establish proof beyond a reasonable doubt whether Shahid's former employer was motivated by retaliation for Shahid's cooperation or anger as to the damage Shahid's criminal conduct did to the Discovery Sales business.

first and last names of a Discovery employee who he holds at least partially responsible for his misconduct and resulting legal predicament. It seems that he did so in order to perpetrate some fraud on or retaliation against her; he contends, unpersuasively, that he was going to use them to act as a whistleblower against the company (this story makes no sense). There is no evidence that Shahid ended up using the domain names for any nefarious purpose, though the episode does speak to his overall character and the need for further specific deterrence in determining the appropriate sentence.

E. Conclusion

For all of these reason, a four level departure because the loss overstates the seriousness of the offense, and a further seven level departure for substantial cooperation are appropriate. This would result in an offense level of 20, with a range of 33 to 41 months in Zone D of the Sentencing Table.

The sentence imposed by the Court should advance the interests of punishment and deterrence. Shahid's conduct was intentional and repeated; he was responsible for selling over 200 homes using incentives that were designed to artificially inflate their value. Shahid's conduct misled the underwriters employed by the mortgage lenders, but more importantly it deceived the market that purchased mortgage loans from the loan originators. The punishment of a prison sentence is appropriate.

It is not at all clear that Shahid has left deceptive conduct in his past, as the domain name purchases appears to show, so a significant sentence is necessary for specific deterrence purposes. The Court's sentence also must speak to others in the real estate and mortgage lending industries who might, in the future, consider this kind of criminal scheme. Educated, sophisticated professionals are a deterrable population that follows developments in their profession; the sentence imposed in this case will be known to them.

///

///

///

///

///

///

///

Accordingly, the government recommends that the Court impose a sentence of 36 months, plus a fine of $15,000. The restitution owed to Fannie Mae and Freddie Mac will be satisfied by Discovery Sales and no other restitution is appropriate.

DATED: February 26, 2017

Respectfully submitted,

BRIAN J. STRETCH
United States Attorney

John H. Hemann

JOHN H. HEMANN
Assistant United States Attorney